LEWIS, J.,
dissenting.
I dissent from the majority opinion and would affirm the convictions of first-degree murder and sentences of death. In my opinion, the testimony of Detective Judy that identified Evans as the voice on the 911 call-back recording was admissible, and the question as to whether Evans had hired a private investigator was not inappropriate. Further, while I do not dispute that the prosecution made multiple inappropriate comments during guilt-phase closing statements, I do not believe that any of these comments, individually or cumulatively, rose to the level of reversible error. I write specifically to discuss the voice identification and private investigator claims.
Voice Identification
The identification of a defendant based solely upon his or her voice is admissible as direct and positive proof of a fact, and the probative value of the identification is a question for the jury. See Martin v. State, 100 Fla. 16, 129 So. 112, 115 (1930). Voice identification testimony may be inadmissible on the basis that it invades the province of the jury where a testifying witness (1) was not an eyewitness to the crime, (2) does not have a special familiarity with the defendant’s voice, or (3) is not qualified as an expert in voice identification. See, e.g., Charles v. State, 79 So.3d 233, 235 (Fla. 4th DCA 2012) (quoting Ruffin v. State, 549 So.2d 250, 251 (Fla. 5th DCA 1989)). Contrary to the conclu-sory statement by the majority, Detective Judy did indeed possess a special familiarity with Evans’ voice and, therefore, the trial court properly allowed him to identify Evans as the speaker on the 911 call-back recording. Any challenge to this testimony is directed to weight, not admissibility.
Detective Judy’s familiarity arose from the fact that he listened to known recordings of Evans’ voice from jail conversations with family members. Further, the record reflects that he listened to the calls in an investigative capacity. During a 2010 deposition, when asked if he heard anything “of value” on the jail recordings with regard to the double homicide, Detective Judy stated that Evans made no admissions or confessions. However, he observed the following:
[T]he first thing that [Evans] says on the calls is, no names. But from listening to the tapes and listening to the 911 call, I easily recognize Rick’s voice. I also recognize the voices of his brothers Glenn, Rodney and his mother Marcia. There’s no problem there. So I would think that that would be of value to the case. And also that he’s always called Rick on all the tapes, when they did use names. And every now and then Rodney slips' and throws in a Rick there, which very much upsets him.
Thus, by listening to the jail recordings, Detective Judy learned that (1) family members call Evans by the name Rick; (2) Evans attempted to dissuade them from using this name during the recorded calls; and (3) Evans became úpset when family members referred to him as Rick.
This testimony demonstrates that Detective Judy did not listen to the jail recordings simply to identify Evans’ voice on the 911 call-back recording during trial. Rather, as the lead detective in the case, he gained a special familiarity with Evans’ voice in the course of his investigative duties; i.e., to obtain further evidence which would corroborate Evans’ participation in the double homicide. Therefore, I would conclude that Detective Judy *1243 clearly met the threshold for admissibility of the identification.
Moreover, Florida courts have consistently allowed law enforcement officers to identify the voice of a defendant where the officer has gained familiarity with the voice. In Vilsaint v. State, 127 So.3d 647, 648 (Fla. 4th DCA 2013), a detective was permitted to identify Vilsaint’s voice on a jail telephone recording where the detective had engaged in a brief conversation with him. Id. Based upon the identification, the trial court admitted the recording, in which Vilsaint made incriminating statements. During trial, the detective admitted that the identification was based on approximately thirty-six words, mostly “yes” and “no.” Id. at 649. Further, while Vilsaint spoke to the detective in English, the recorded conversation was in Creole. Id. In affirming the trial court’s admission of the identification, the Fourth District Court of Appeal stated:
Here, the detective spoke to appellant for approximately ten to fifteen minutes prior to appellant being put in the cell. He said that based upon this he could identify appellant’s voice on the tape. • This was sufficient to satisfy authentication, and the trial court did not abuse its discretion by overruling defense counsel’s objection to the identification. The jury could determine for itself the credibility of that identification.
Id. at 650 (emphasis supplied).
Similarly, in Barrientos v. State, 1 So.3d 1209, 1211 (Fla. 2d DCA 2009), a law enforcement officer was allowed to testify that the voice recorded on an electronic listening device worn by a confidential informant was that of Barrientos based on the fact that the officer had heard his “deep, raspy voice” during a single encounter that had occurred approximately four years earlier. Counsel for Barrientos asserted it was implausible that the officer would remember the sound of Barrientos’ voice • under such circumstances. Id. at 1212-13. The Second District Court of Appeal held that the officer’s testimony was admissible, but- explained that the credibility of that evidence was a jury question. Id. at 1213; see also Worley v. State, 263 So.2d 613, 613 (Fla. 4th DCA 1972) (officer who received anonymous bomb threats was permitted to identify the defendant by voice as the person who placed the calls; the Fourth District noted that “[t]he credibility of such evidence is clearly a jury question”).
Even in the cases relied upon by the majority, the district courts have held that identifications by police officers are permissible where the officers have gained a special familiarity with the defendant. In State v. Cordia, 564 So.2d 601, 601 (Fla. 2d DCA 1990), the Second District granted a petition for writ of certiorari and quashed the portion of a trial court order that excluded the voice identification testimony of two police officers. Cordia was an officer who called the police department of a nearby municipality and submitted a false report that bombs had been planted there. Id. The officers whom the State sought to present knew Cordia and had spoken with him in person, over the telephone, and over a police radio, but they were not the officers who had received the call. Id. at 601-02. The' Second District concluded that because the officers claimed to possess special knowledge of Cordia’s voice characteristics, they could offer an opinion as to whether it was his voice on the call. Id. at 602. Conversely, in Ruffin, 549 So.2d at 251, the Fifth District reversed the defendant’s convictions on the basis that the identification of Ruffin by three officers as the man on a videotape selling cocaine was improper. However, the Fifth District specifically noted that the officers did not possess a special familiarity with *1244 Ruffin. Id; see also Charles, 79 So.3d at 235 (holding it was error to allow a detective to testify that it was Charles who appeared on a surveillance video where the detective had no special familiarity with Charles).
In Day v. State, 105 So.3d 1284, 1286-87 (Fla. 2d DCA 2013), and Hardie v. State, 513 So.2d 791, 792 (Fla. 4th DCA 1987), the district courts also held that police officers could offer opinions as to whether the defendants were the individuals depicted on video recordings committing crimes where the officers had prior knowledge of or contact with the individuals. The convictions in these cases were reversed only because the officers identified themselves to the jury as such and, therefore, rendered it “inconceivable” that the jury would not conclude the defendants had been involved in other criminal activities. Day, 105 So.3d at 1288; Hardie, 513 So.2d at 793-94. Unlike Day and Hardie, however, Detective Judy became familiar with Evans’ voice through his investigation of these homicides — not through investigations of any prior criminal activity by Evans, which could have suggested to the jury that Evans previously had engaged in criminal conduct. Therefore, Day and Hardie are totally distinguishable and do not support the proposition that Detective Judy should not have been allowed to identify Evans as the speaker on the 911 callback recording.
Consistent with this precedent, it is apparent that the trial court did not commit an abuse of discretion because the record demonstrates that Detective Judy possessed a special familiarity with Evans’ voice. See Overton v. State, 801 So.2d 877, 896 (Fla.2001) (an abuse of discretion does not occur “unless no reasonable person would take the view adopted by the trial court”). The probative value and credibility of Detective Judy’s identification was a question for the jury. Martin, 129 So. at 115; Vilsaint, 127 So.3d at 650, Barrientos, 1 So.3d at 1213; Worley, 263 So.2d at 613.
Private Investigator
I would further conclude that the trial court properly denied Evans’ motion for a mistrial and declined to give a curative instruction after the prosecutor asked Evans whether he had hired a private investigator to discover information about Taylor. A motion for mistrial should be granted only when the error is so prejudicial that the entire trial is vitiated. England v. State, 940 So.2d 389, 401-02 (Fla.2006).
In my view, this question was not inappropriate and, therefore, no error occurred. According to the prosecutor, Beth had informed multiple individuals that Evans had hired a private investigator. Her statements were supported by the fact that on the morning of December 20th, when she told Evans the name of her date, Evans informed her that he knew where Jerry Taylor lived and how many children he had. The fact that Evans confronted Beth with this information supported her statements that Evans hired someone to investigate Taylor. Therefore, I would conclude that the prosecutor possessed a good faith basis to ask this question.
Further, the prosecution was not required to introduce evidence during rebuttal to demonstrate that Evans had in fact hired a private investigator. In Carpenter v. State, 664 So.2d 1167, 1167 (Fla. 4th DCA 1995), the prosecutor asked Carpenter, who claimed self-defense, whether he had told a third party that he shot the victim because he was “sick and tired of the crap.” After Carpenter denied making the comment, the prosecutor attempted to approach Carpenter with the written statement of the third party that contained the comment. Id. at 1167-68. Thereafter, defense counsel objected on the basis of *1245 hearsay. Id. at 1168. The trial court sustained the objection, denied a motion for mistrial, and instructed the jury that a question is not evidence. Id. The prosecutor did not present the .third party as a witness on rebuttal or attempt to establish that the third party made the statement. Id.
The Fourth District rejected Carpenter’s assertion that the failure of the prosecutor to prove the fact insinuated by the question demonstrated that the prosecutor did not act in good faith. Id. at 1169. Instead, the district court concluded that such a question is permissible where the trial court is satisfied the prosecution has a good faith belief that the insinuated fact is true. Id. at 1167. Further, the Fourth District noted that a respected legal treatise totally disagreed with the rationale in Marrero v. State, 478 So.2d 1155 (Fla. 3d DCA 1985), a decision from which the majority quotes in support of its conclusion that the private investigator question was inappropriate:
Recently, two District Courts of Appeal have apparently added a new requirement to the use of prior inconsistent statements. In Marrero v. State, it was held for the first time that if a witness denies making the prior inconsistent statement, counsel must prove that the prior statement was made. The court interpreted the requirement, that counsel have a good faith basis before a question could be asked which impeaches the credibility of a witness, as requiring the actual introduction of the statement. These opinions did not cite other authority nor do they logically flow from the “good faith requirement.” ... The logical result of the Marrero decision is to limit any cross-examination regarding credibility to situations in which counsel has “a witness-room full of witnesses prepared to give back-up testimony. Such an approach would unduly inhibit impeachment by imposing overwhelming burdens, delays, and expenses on showing good faith.”
Carpenter, 664 So.2d at 1168-69 (quoting Charles W. Erhardt, Florida Evidence, § 608.4 (1995 ed.)). I would conclude that both Carpenter, and the legal treatise upon which it relied, provide the more logical approach when a prosecutor asks an insinuating question in good faith, i.e., it is admissible, and the introduction of evidence to support the question is not required. Therefore, the trial court here properly denied the motion for mistrial because the prosecutor possessed a good faith basis to ask the private investigator question.
Additionally, even if the question had not been asked in good faith — which I believe it was — any error was harmless. First, the hiring of a private investigator is neither uncommon nor illegal. Contrary to the assertion of the majority, it does not constitute evidence of premeditation to commit murder or that Evans entered Beth’s home with the intent to commit a felony. Second, the jury heard Evans refer to Beth’s companion as “Jerry” on the 911 call-back recording, despite his testimony that he did not know the name of the man Beth was seeing that night. This evidence demonstrated that Evans had somehow acquired Jerry’s name prior' to the 911 call-back. Although one explanation is that Evans did in fact hire a private investigator, other explanations were posited during closing statements. It was for the jury to determine which scenario to believe with regard to how the intruder knew Jerry’s name.

Conclusion

For the foregoing reasons, I would conclude that no reversible error occurred, and I dissent from the decision of the majority to grant Evans a new trial. In *1246 stead, I would affirm his convictions and sentences of death.
POLSTON, J., concurs.